Albert Baer, Plaintiff, *v.* Charles W. Bonynge, Defendant.

72   33
147a 393

*Principal and agent — liability of the agent to a third party for the failure of the principal to perform a contract made by the agent on his behalf with such party.*

A person acting as agent is not liable for the failure of his principal to perform a contract entered into by the agent in behalf of the principal (as, *e. g.*, a contract for a lease from the principal, of premises owned by him), unless he acts for an undisclosed principal, or without authority, which is unknown to the other party, or unless he binds himself personally by the contract.

Motion by the plaintiff for a new trial on a case containing exceptions ordered to be heard at the General Term in the first instance,

by an order made on the dismissal of the complaint at the New York Circuit on the 3d day of April, 1893.

This action was brought for the recovery of damages resulting from the defendant's refusal to execute a lease to the plaintiff. Amos R. Eno, the former owner of No. 922 Broadway, leased it until May 1, 1891, to John W. Salter, who assigned his lease to the plaintiff, under which the plaintiff occupied the premises for a butcher's shop and market for four years. Whether he occupied the whole or but part of the premises, does not appear. At some time prior to 1890, Eno conveyed the premises to Rodie S. Bonynge, the defendant's wife. The plaintiff testified that five or six months before October 27, 1889, which would be in May or June, he had a conversation with defendant about a new lease, in which it was stated, " I (plaintiff) told him (defendant) I wished to renew the lease, as I wished to make some alterations about the building, and if I would not get the lease I would not do it; so he said, ' You can go right ahead. No one will get the lease but you.' I said, ' I am never sure of anything unless I have it. I would rather have it in my pocket than wait for it.' He said, ' You can take my word for it. That is all you will have, my word; you can go ahead and paint the house and do all the repairs you want.' So he said, ' You can go ahead with all the alterations you want to do.' I said I wanted to put a new front in the building, as it was getting a kind of old now and bad, and he said, ' You can go right ahead.' So I went and got the house painted, and got the roof fixed, and got the sidewalk all around fixed, and put the building in good condition."

September twenty-fourth defendant wrote the plaintiff as follows:

                                        " London, *Sept.* 24th.

" Dear Sir — I would have been in New York before this. *   *   *   However, I am due in New York in the first week of November, and will call and see you. Have not offered the lease to anyone. Glad to hear you are doing well.
                              " Very truly,
                                        " C. W. BONYNGE."

Early in November the plaintiff received from the defendant the following letter:

"42 PRINCE'S GATE, LONDON, *Oct.* 27, '89.

"DEAR MR. BAER — I expect to be in New York a week or so after this letter reaches you; and, if you wish to renew a lease, please have the names of the parties you offered to go on your security ready to submit, as I will be there but a short time. I hope to find the building painted, and that the roof has been put in good condition as agreed on. I need not tell you other people want it. Hope you have a good business and doing well.

"Very truly,

"C. W. BONYNGE.

The defendant returned to New York the first week of November, when he called on the plaintiff and told him that he would let him know the terms of the lease within a few days; that he would get an appraiser and see what the lease was really worth. A few days afterwards the defendant gave the plaintiff the following documents:

"FIFTH AVENUE HOTEL,
"MADISON SQUARE, NEW YORK.
."*Friday.*

"DEAR MR. BAER — I had a valuer to-day up to look at building and situation, a man of very good judgment, and I asked him to make a fair estimate of the rent for the next ten years. I told him what you were paying and what I thought it worth. He said I was much too low; that since Salter took that lease property and rents had gone up there fully forty per cent, and he put the lease of the same nature as the present at $14,000 a year. So I have made up my mind to drop $1,000 off this and make it $13,000 for the next ten years. You to make any terms you like about the upper portion of the building, but you must let me know what the rent of the basement is to be and have it agreed on; from what I hear I would not make his lease less than $3,000 a year.

"Now let me tell you what I find. When Salter went in there the rent from the basement was only $900 the first year, then $1,200, and the rooms up stairs $2,500, making, say, $3,500 in all for the first two years. Take his rent and taxes at $12,000 and deduct the $3,500, and you find Salter paid $8,500 for his part ten years ago. Now, if you wish to have it at $13,000, say, with taxes, $15,000, deduct basement, $3,000, rooms, $3,500, making $6,500, making

your rent just the very same as Salter paid ten years ago. This is my conclusion after getting two very good opinions on it. I inclose a card with my ideas of the lease.

. " Yours truly,

" C. W. BONYNGE.

" We think inside of ten years this lease will be a very low one."

" Rent, $13,000 with, in addition, to pay all taxes and improvements. Roof to be painted every year, outside of building every three years. Rent in gold coin to be paid July 1st, October 1st, January 1st, April 1st. No structures to be allowed in or about the building nor on the roof. No flagstaffs or anything similar to be permitted.

" Violations to work forfeiture of lease. No transfer of lease without consent of owner. Two good signers to be provided. Taxes, water to be paid on maturity and receipts for same furnished the owner. No objectionable business to be allowed on premises."

The day following the receipt of these documents the plaintiff told the defendant he would accept the terms offered, and a few days afterwards the defendant procured to be drafted in duplicate a proposed lease, the material parts of which are as follows : " Lease dated November 28, 1890, between Rodie S. Bonynge, of St. Louis, Missouri (but now temporarily residing in London, England), and Albert Baer, duly executed and acknowledged by said Baer, demises the lot of land and building 922 Broadway, New York City, for the term of ten years from May 1st, 1891, at the yearly rent of thirteen thousand dollars in gold coin, payable in quarterly payments on the first days of July, October, January and April, containing the usual covenants and the following special provisions : That the tenant will pay on maturity the annual rent or charge for Croton water, and deliver to the landlord proper receipts showing such payment ; that the tenant will also pay on maturity all taxes and deliver proper receipts showing such payment ; that the tenant will, at his own expense, do all the repairs and keep and maintain the premises in good condition, and will not permit any flagstaff or poles on the roof, will paint the roof once in each year, and the whole building inside and out once in every three years, the first painting to be completed by August 1, 1891 ; that the tenant will not assign the lease

or underlet without the written consent of the landlord, and will not use the premises for any purpose deemed extra hazardous or a nuisance, and that if default be made in any of said covenants, the landlord may re-enter and re-possess the premises. There are also covenants that in case the premises be destroyed by fire the landlord shall have the right to cancel the lease and apportion the rent, unless she elect to repair, in which case the repairs shall be made with reasonable dispatch, and during the period of repairs no rent shall accrue; also, that in case of an assessment for public improvement six per cent interest on the amount of such assessment shall be added to the rent."

The plaintiff signed the proposed lease and procured Samuel Lichenstein and Lewis Samuels to execute and acknowledge the guaranty indorsed thereon. Thereupon the plaintiff personally mailed one of the duplicates so executed to the defendant's wife at London for execution by her. A few days after the duplicate had been mailed the defendant told the plaintiff that he should write and advise his wife not to execute it because the plaintiff refused to lease the basement to Mr. Streuver for ten years at not less than $3,000 per year. The defendant's wife refused to execute the lease, and December 20, 1890, this action was brought, and May 1, 1891, the plaintiff vacated the premises which had been leased to another person.

*Albert Stickney*, for the plaintiff.

*George L. Rives*, for the defendant.

Follett, J.:

This action is for the recovery of damages for the alleged breach of a contract to procure a contract to be made. It should be borne in mind that the defendant did not own the property of which the plaintiff desired a lease, but it was owned by his wife, which fact was known to the plaintiff, as appears by the third subdivision of his complaint and from his testimony. He testified that defendant told him that his wife owned the property and that he (the plaintiff) told the defendant that he desired that the proposed lease should be executed by defendant's wife because he did not produce a power of attorney authorizing him to execute a lease for her. It

is plain that the negotiations between the litigants were carried on with knowledge that defendant's wife owned the property, and with the understanding that she should become the lessor, and that the defendant was acting as her adviser, or at most, as her agent. A person acting as agent is not liable for the failure of his principal to perform a contract entered into by the agent in behalf of the principal unless he acts for an undisclosed principal, or without authority, which is unknown to the other party, or unless he binds himself personally by the contract. The defendant was not acting for an undisclosed principal; he did not bind himself personally, and it was not shown that whatever he did was without authority, and it is difficult to see upon what principle he can be held liable in this action. It seems unnecessary to consider the question discussed on the argument and on the briefs, whether, under the Statute of Frauds, a valid lease, or a valid contract to give one, founded on a good consideration, arose out of the negotiations, oral and written, between the litigants, for the defendant did not assume to contract for himself, but for his wife. It seems that the defendant's advice to his wife not to execute the lease, was based on the plaintiff's unwillingness to make a satisfactory sublease of the basement. The letter stating the terms of the proposed lease contains the following: " You to make any terms you like about the upper portion of the building, but you must let me know what the rent of the basement is to be, and have it agreed on ; from what I hear I would not make his lease less than $3,000 a year." The proposed lease provides : " That the tenant will not assign the lease or underlet without the written consent of the landlord." The defendant expressed dissatisfaction with the sublease of the basement which the plaintiff proposed to give to Mr. Streuver.

The plaintiff's motion for a new trial should be denied, and a judgment ordered for the defendant, with costs.

O'Brien and Parker, JJ., concurred.

Plaintiff's motion for a new trial denied, and a judgment ordered for the defendant, with costs.